**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**UNITED STATES OF AMERICA**

**v.** **Case No. 2:22-cr-00095**

**JAMES GOULD**

# DEFENDANT'S *BRUEN*-BASED MOTION TO DISMISS

On May 3, 2022, a federal grand jury sitting in Charleston, West Virginia, returned a single count indictment charging James Gould with unlawfully possessing a Remington, 11-87, 12-gauge shotgun (a hunting long gun), on February 18, 2022 - after having been previously involuntarily committed on July 30, 2019, in violation of 18 U.S.C. §§ 922(g)(4) & 924(a)(2). *See* Dkt. No. 1. Defendant was arrested August 23, 2022 on his federal indictment. *See* Dkt. No. 19. On August 30, 2022, the United States' motion to detain Mr. Gould was granted over defendant's objections. *See* Dkt. No. 23.

After his indictment was returned, but prior to Mr. Gould's federal arrest - on June 23, 2022, the Supreme Court of the United States rendered its decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* marked a dramatic shift in post-*Heller* Second Amendment jurisprudence. Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on

the challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts, instead, to consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects that conduct." *Id.* at 2129-30 (emphasis added). To rebut the presumption, the government must affirmatively show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted during and around the founding era, when the Second Amendment was adopted.

Under the new framework mandated by *Bruen*, this Court should dismiss the indictment against James Gould, which charges him with being a previously involuntarily committed citizen subsequently in possession of a firearm under 18 U.S.C. § 922(g)(4). At all times relevant the firearm possessed by Gould was not a dangerous or unusual weapon, and was in common use at the time for lawful purposes. Because possession of a long-barreled shotgun in the home comes within the Second Amendment's "plain text," and Section 922(g)(4) infringes upon Gould's keeping and bearing any firearm - Gould's conduct was and is presumptively protected. Gould's having been previously involuntarily committed

does not remove him from the Second Amendment's protections, or *Bruen*'s presumption of unconstitutionality. Defendant contends that the government will be unable to rebut that presumption under *Bruen*'s step two - by pointing to a distinctly similar, well-established and representative, historical tradition of firearm regulation. Permanent involuntary commitment disarmament laws, which did not appear in the United States until the Twentieth century, were unknown to the generation that ratified the Second Amendment. As a consequence, defendant's indictment must be dismissed.

## *I. Factual background.*

Defendant does not expect the United States to dispute or otherwise contest the following facts. On July 30, 2019, on an application filed by his brother Bryan Gould and Jackson County Sheriff's Deputy Herbert Faber, and after a finding of probable cause for involuntary hospitalization, defendant was involuntarily committed by the Jackson County Circuit Court for a mental health examination as provided under W.Va. Code § 27-5-2. Defendant's commitment order expressly provided, pursuant to W.Va. Code § 61-7-7(a)(4), that he was required to immediately surrender any firearms "in their ownership or possession" to the Jackson County Sheriff. Subsequently, over two and half years later on February 18, 2022, defendant was found to be in possession of the 12 gauge shotgun and a box of turkey shells in his Ravenswood, West Virginia home.

## *II. Legal background.*

### A. 18 U.S.C. § 922(g)(4).

18 U.S.C. § 922(g)(4) provides that it shall be unlawful for any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess in or affecting commerce, any firearm or ammunition. The United States' indictment sounds in the second clause or disability under Section 922(g)(4), which is that Mr. Gould is a citizen who has previously "been committed to a mental institution." *See* Dkt. No. 1. If convicted, Mr. Gould is in jeopardy of being imprisoned for up to ten years. *See* 18 U.S.C. § 924(a)(2).

In order for Mr. Gould to be convicted under Section 922(g)(4), the United States would have to prove beyond a reasonable doubt (1) a status element, i.e. that Mr. Gould was someone previously involuntarily committed; (2) a possession element, i.e. that Mr. Gould possessed the firearm identified in the indictment; (3) a jurisdictional element, i.e. that the particular firearm traveled in or affecting interstate commerce; and (4) a firearm element, i.e. a device meeting the statutory definition of a firearm. The scienter requirement of "knowing" for a Section 922(g)(4) offense applies to elements (1), (2) and (4). *See Rehaif v. United* States, 139 S. Ct. 2191, 2195-96 (2019).

Whether a defendant has previously been "committed" to a mental institution is a question of federal law, but in making that determination the Court

must consider state law. *See e.g. United States v. Waters*, 786 F.Supp. 1111, 1114 (N.D.NY 1992). For purposes of defendant's motion, and without conceding the issue otherwise, let's assume that involuntary commitment for a mental health evaluation under West Virginia law fits the definition of "committed to a mental institution" under Section 922(g)(4). *See United States v. Collins*, 982 F.3d 236 (4th Cir. 2020).[1]

Section 922(g)(4) was enacted as part of the Gun Control Act of 1968. *See* Pub. Law 90-618, 82 Stat. 1213, 1220 (Oct. 22, 1968) & Conf. Rep. 90-1956, 1968 U.S.C.C.A.N. 4426 (1968). The Fourth Circuit, post-*Heller* but pre-*Bruen*, rejected an as applied challenge to Section 922(g)(4) in part because *Heller* found (in *dicta)* that regulations prohibiting the mentally ill from possessing firearms are "presumptively lawful". *See Collins*, *supra*, 982 F.3d at 243. This district has previously held that Section 922(g)(4) is narrowly tailored "in that it grants states the opportunity to provide a process by which those Second Amendment rights can be regained and the disability removed after competency is restored." *See United States v. Collins*, No. 5:18-cr-00068, 2018 WL 3084708, at *5 (S.D.W.V. June 22, 2018)(ICB).

1 Under West Virginia law, if Mr. Gould's involuntary commitment actually resulted from a physiological, as opposed to a true mental health condition, then he would not have been prohibited from possessing a firearm under Section 922(g)(4).

Under 18 U.S.C. § 925(c), a person previously committed to a mental institution supposedly can petition the Attorney General for relief from the firearm ban in Section 922(g)(4). Since 1992, however, Congress has prohibited use of appropriated funds for investigating or acting on such petitions. *See United States v. Booker*, 570 F.Supp.2d 161, 164 n. 2 (D. Me. 2008). As a consequence, what may have initially been intended as a form of temporary conditional disarmament in 1968, has operated as a form of permanent disarmament since at least 1992. This means that someone like Mr. Gould is not just disarmed temporarily during any period in which he may have been involuntarily committed, but in perpetuity for the rest of their life. And to the extent he possesses a firearm during that time, he is subject to further felony prosecution under Section 922(g)(4).

In the wake of the 2007 Virginia Tech massacre, Congress did enact the NICS Improvement Amendments Act of 2007, authorizing federal grants to help states improve the quality of the mental health information they make available to the databases searched by the national instant criminal background check system ("NICS") when an individual tries to purchase a firearm. Pub. L. No. 110–180, § 103(a)(1), 121 Stat. 2567 (2008). To be eligible for a grant, a state must certify that it has implemented a program allowing those disqualified from possessing a firearm under § 922(g)(4) to apply to the state for relief from that firearm disability. *Id.* § 103(c), 121 Stat. 2568; *id.* §

105(a), 121 Stat. 2569. As a practical matter, however, the 2007 legislation does nothing to address the continuing Congressional prohibition regarding Section 925(c). To date, only thirty-two states have created programs for obtaining relief from a prior mental health disability – with varying standards and results. *See* Laura E. Johnson, *Mental Health History is History: A Lifetime Ban on Gun Possession Due to History of Involuntary Commitment Violates the Second Amendment*, 100 N.C.L. Rev. 919, 923 (2022).

### B. Before ***Bruen***, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, colonial law and practice leading up to and immediately following 1791, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second

Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed *Heller*'s "central holding": that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780 (2010). In holding that the Second Amendment applies against the states as well as the federal government, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 767. And that right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end

scrutiny." *Id.* Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

### C. *Bruen replaced means-ends interest balancing with a test rooted solely in the Second Amendment's "text and history."*

*Bruen* expressly disavowed the lower courts' post-*Heller* framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Answering this threshold question in *Bruen* was straightforward. At issue there was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protects [the

petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement, which burdened that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139

(concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

**III. ARGUMENT**

The Second Amendment was ratified December 15, 1791.[2] Every existing federal firearm regulation was subsequently enacted during the Twentieth Century or later. Generally, those surviving constitutional challenges, at least before *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 142 S. Ct. 2111 (2022), have been sustained through rational basis review subject to the unconstitutional collectivist interpretation of the Second Amendment,[3] *or* post *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008), through intermediate scrutiny review subject to the individual rights interpretation of the Second Amendment.[4] By dispensing with means-ends scrutiny, *Bruen* refined *Heller* to the point all modern federal firearm regulations are now subject to reexamination under the Second Amendment, using *Bruen*'s plain text and history standard.

*Bruen* says when the Second Amendment's plain text covers an individual's conduct – the Constitution presumptively protects that conduct. To justify any

---

[2] *See e.g.* U.S. Const., amend. II, historical note; *Raffone v. Adams*, 468 F.2d 860, n.4 (2nd Cir. 1972); National Archives, Milestone Documents, Bill of Rights, https://www.archives.gov/milestone-documents/bill-of-rights.

[3] *See e.g. United States v. Johnson*, 497 F.3d 548, 550 (4th Cir. 1974).

[4] *See e.g. United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016); *United States v. Carter*, 750 F.3d 462 (4th Cir. 2014); *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012); *United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).

regulation, the Government must demonstrate that it is consistent with this Nation's well-established and representative historical tradition of firearm regulation. Only if this showing is made, may a court conclude that an individual's conduct falls outside the Second Amendment's "unqualified command". *Bruen*, 142 S. Ct. at 2126.

This case is *not* about whether the Second Amendment, post-*Bruen,* still "allows a 'variety' of gun regulations." *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). It does. This case is *not* about whether disarming previously involuntarily committed citizens, either temporarily or permanently, is good policy. Rather, this case is about whether Section 922(g)(4), post-*Bruen,* violates the Second Amendment. Finding Section 922(g)(4) facially unconstitutional and dismissing Gould's indictment will not mean the Second Amendment is "unlimited," any more than *Heller*, or *Bruen* have made it unlimited.

### *A. Standard of Review.*

Under Fed. R. Crim. P. 12, district courts should dismiss criminal charges where there is an infirmity of law in the prosecution – such as an unconstitutional statute. *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).

### *B. Gould, and his conduct, are protected by the Second Amendment, such that Section 922(g)(4) is presumptively unconstitutional.*

Through the operative clause, the textual substance of the individual right protected by the Second Amendment is "to keep and bear arms in case of confrontation." *See Heller*, 554 U.S. at 581, 591; *Bruen*, 142 S. Ct. at 2127. *Heller*

acknowledged Second Amendment protection of this *conduct* inside the home, *Heller*, 554 U.S. at 635; *Bruen* acknowledged Second Amendment protection of this *conduct* outside the home. *Bruen*,142 S. Ct. at 2122. Under the standard announced in *Bruen*, Section 922(g)(4) directly burdens Mr. Gould's Second Amendment right to keep and bear arms.

Note, the amendment's "plain text" does not differentiate between persons previously involuntarily committed and other members of "the people," and a total permanent prohibition on firearm possession by citizens who have previously been involuntarily committed presumptively violates the Second Amendment. *See United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240 (5th Cir. 2023) (finding that Second Amendment protections are not limited just to "law abiding citizens," and that18 U.S.C. § 922(g)(8) is unconstitutional).

*Heller* supports this understanding. Construing the words "the people" in that case, the Court said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580 (emphasis added). The Court determined that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments—"is exercised individually and belongs to *all* Americans." *Id.* (emphasis added); *see also Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined

restrictions." (emphasis added)). Interpreting "the people" to exclude previously involuntarily committed citzens would conflict with that principle. Section 922(g)(4), therefore, is presumptively unconstitutional.

As will be demonstrated below, the government will be unable to rebut this presumption. Permanent involuntary commitment disarmament laws, which did not appear in this country until the 20th century, were unknown to the founding generation. There was no "historical tradition," as of 1791, of permanently barring previously involuntarily committed citizens from possessing firearms, much less imprisoning them for determinant periods as felons. More recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted. Which is why, post-*Bruen*, this Court should dismiss Mr. Gould's indictment.

**C. "At the time of the Founding" directs *Bruen*'s historical inquiry.**

In the context of historical federal firearm regulations, *Bruen*'s second prong focuses on how Second Amendment protections were burdened or otherwise limited "at the time of the Founding." This is because "constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen,* 142 S. Ct. at 2136.

In *United States v. Cruikshank*, 92 U.S. 542 (1875), the Supreme Court acknowledged that the rights protected by the Second Amendment were "not granted

by the Constitution [or] in any manner dependent upon that instrument for its existence. The second amendment … means no more than that it shall not be infringed by Congress." *Heller* repeatedly reaffirmed this position, and – in assessing the constitutionality of a federal firearm regulation – looked to 1791, not 1868. *See Heller,* 554 U.S. at 592, 619-20. *Bruen* similarly says the Court has "generally assumed that the scope of the protection applicable to the Federal Government and the States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen,* 142 S.Ct. at 2137. Because *Bruen* expressly said it "need not address" whether 1791 or 1868 provides the proper historical baseline, that opinion provides no basis for deviating from the Supreme Court's normal "assum[ption]." *Bruen,* 142 S. Ct. at 2138. Consistent with *Heller*, "*Bruen* is clear that the Second Amendment 'codified a right inherited from our English ancestors," a right that '*pre-existed*' the Constitution. *Bruen,* 142 S. Ct., 2130, 2139. The entire universe of permissible firearm regulations, then, was set at the adoption of the Bill of Rights, if not earlier." *United States v. Love*, 2022 WL 17829438, at *4 (N.D. Ind. 2022).

The emphasis on the time the Constitution and Second Amendment were ratified is the foundation of *Bruen*'s "text and history" standard. What made up the United States – i.e. what sovereign states geographically made up our country; and therefore what jurisdictions' laws should be consulted for historical restrictions on Second Amendment protections, is defined by "at the time of the Founding." The

United States' Constitution was signed on September 17, 1787, then ratified by nine of the thirteen state legislatures between December 7, 1787, and June 22, 1788. The Confederation Congress began operating under the new Constitution on March 9, 1789. The Bill of Rights were later ratified on December 15, 1791. So the "time of the Founding" essentially consists of mid-1787 to the end of 1791. Geographically, by the end of 1791, our physical country consisted of thirteen sovereign states, and two territories on the north and south sides of Virginia:[5]




[5] Wikipedia Commons, United States 1791-09-1792-03.png map, https://upload.wikimedia.org/wikipedia/commons/4/43/United_States_1791-09-1792-03.png.

*Bruen* does say that courts *may* still look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving post-enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But ***the farther forward in time one goes from 1791, the less probative historical evidence becomes***. *See id.* at 2137 (emphasis added)("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but

should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original)("[T]o the extent later history contradicts what the text says, the text controls."). Looking to 1791, the Court in *Bruen* ultimately held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56.

Given the composition of our country "at the time of the Founding," post-*Bruen* courts should look to the particular history of laws and traditions followed by the first thirteen states between mid-1787 and the end of 1791. This would be the strongest evidence of any distinctly similar historical tradition of firearms regulation consistent with the Second Amendment, particularly with respect to societal problems which existed in 1791.

**D. *Bruen*'s "distinctly similar" and "relevantly similar" anological inquiries work as alternatives. *Bruen*'s "relevantly similar" inquiry is limited to particular circumstances and not a supplemental "do over" for regulations failing *Bruen*'s "distinctly similar standard".**

*Bruen* sets out two different analogical inquiries for determining whether a challenged regulation is consistent with our Nation's historical tradition of firearm regulation. Which inquiry applies depends on what kind of problem a statute targets and whether it is old or new.

In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be fairly straightforward." *Bruen,* 142 S. Ct. at 2131. For such statutes, "the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Ibid.* (emphasis added). If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, then the law "[i]s unconstitutional" today. *Ibid.* Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Ibid.* Both *Heller* and *Bruen* fell in this first category: the laws challenged in those cases were aimed at a problem – "handgun violence, primarily in urban areas" – that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Ibid.*

Conversely, in "other cases," a challenged law will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S.Ct. at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Ibid.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are *relevantly similar.*"

*Ibid.* (emphasis added). The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—what the Court called the "how" and the "why." *Id.* at 2133 (emphasis omitted).

This "relevantly similar" inquiry – which the Court did not undertake in *Bruen* – is less onerous. Unlike the "distinctly similar" standard, it may be satisfied even if the Government does not identify "a historical *twin*" or "a dead ringer" for a modern firearm regulation. *Bruen,* 142 S.Ct. at 2133.[6] But courts may employ the "relevantly similar" approach only when the challenged statute is geared toward a societal problem that would have been "unimaginable at the founding." *Id.* at 2132. It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131.

At the threshold, therefore, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132; *see United States v. Lewis*, 2023 WL 187582, at *3 (W.D. Okla. 2023)("[T]he court concludes, upon careful reading of [*Bruen*], that it does articulate two standards for

6 Even when on the "relevantly similar" track, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Ibid.*

assessment of the Government's proffered historical analogues, depending on whether the 'challenged regulation addresses a general societal problem that has persisted since the 18th century,' or whether the statute addresses 'unprecedented societal concerns or dramatic technological changes'," *quoting Bruen*, 142 142 S. Ct. at 2131-32.

*Bruen's* historical second prong is not linear, or multi-tiered. If a distinctly similar historical analogue does not exist regarding a societal problem which existed at the Founding, the challenged regulation is unconstitutional. That is the end of the inquiry. The Government is not permitted a less demanding "do-over" to explore whether there might be an alternately "relevantly similar" historical analogue. The distinctly similar and relevantly similar inquiries operate as alternatives: one applies to statutes aimed at *old* problems, the other applies to statutes aimed at *new* problems. The relevantly similar inquiry is not a supplemental approach the Court may turn to if the distinctly similar analysis does not work out. *See Bruen,* 142 S. Ct., at 2131-2134. Were Courts or the government allowed to go straight to the much more deferential "relevantly similar" inquiry, there would have been no reason for *Bruen* to have even recognized or discussed the "distinctly similar" anological inquiry requiring a tighter fit – which is what was actually applied in that case.

**E. The societal problem addressed by Section 922(g)(4) existed at the time of the Founding, and is neither "unprecedented," "unimaginable at the founding," or based on any "dramatic technological changes."**

The societal problem Congress sought to address through Section 922(g)(4) was firearm violence by the mentally ill. Irrespective of that being or not being a laudable policy objective (which permanent disarmament has not really effectively advanced[7]), this was not a problem that came about during the Twentieth century, that was unimaginable at the founding, or which arose from dramatic technological changes. Firearm violence by the mentally afflicted existed in 1791 when the Second Amendment was ratified. Given the nature of the problem targeted by Section 922(g)(4), the appropriate analogical inquiry under *Bruen*'s second prong should be the "distinctly similar standard, not the "relevantly similar" standard.

**F. The government will be unable to carry its burden of establishing a historical tradition of involuntary commitment disarmament laws.**

In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 &

---

7 *See e.g. The Effects of Prohibitions Associated with Mental Illness*, Rand, Gun Policy in America (Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/mental-illness-prohibitions.html ; *Mental Illness and Gun Violence*, The Educational Fund to Stop Gun Violence, https://efsgv.org/learn/learn-more-about-gun-violence/mental-illness-and-gun-violence/;
Jacob Sullum, Disarming 'Individuals With Mental Illness' Would Affect a Quarter of the Population, Reason (Feb. 16, 2018), https://reason.com/2018/02/16/disarming-individuals-with-mental-illnes/ ; Jacob Sullum, Psychiatrists Explain Why Disarming the 'Mentally Ill' Won't Prevent Mass Murders, Reason (Oct. 16, 2013), https://reason.com/2013/10/16/psychiatrists-explain-why-keeping-guns-f/ (all last viewed Feb. 17, 2023).

n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142.

That the Founding generation would have been reluctant, if not unwilling, to embrace permanent citizen disarmament as a mechanism of societal problem solving - in any context - is not surprising, particularly when you keep in mind the historical circumstances in which the Constitution and the Second Amendment were ratified. British General Thomas Gage's sinister deception during the siege of Boston between April 19, 1775 and March 17, 1776, was still very much "top of mind" with the founding generation when our Constitution was ratified in 1791. Recall that shortly after the Battle of Lexington and Concord, Gage extended the offer to Boston colonists to disarm themselves under the promise of being allowed to leave the city. In response, Boston residents surrendered 2,674 firearms: 1778 muskets, 634 pistols, 973 bayonets, and 38 blunderbusses. The number of firearms seized by one account was one for every 5.6 inhabitants of a town with a population of 15,000. Having disarmed the local populace, within five days Gage reneged on his promise to allow any exit from Boston, and kept the entire city captive for eleven months. Nothing like that had ever happened in the American Colonies before, nor has it happened since. *See* Stephen P.

Halbrook, *When the Redcoats Confiscated Guns*, Washington Post, May 31, 1995[8]; Stephen P. Halbrook, *That Every Man Be Armed*, at 59 (Albuquerque, N.M. – University of New Mexico Press, 1984); Stephen A. Halbrook, The Founders' Second Amendment, at 2-3 & 75-108 (Ivan R. Dee Publishers 2008). As noted by Mr. Halbrook's well-researched treatise –

> Americans were reminded of Gage's confiscation of arms some fourteen years later, when adoption of the Bill of Rights was pending. In 1789, Dr. David Ramsay published his History of the American Revolution. A prominent federalist, Ramsay wrote this work while he was a member of the Continental Congress in the 1780s. He also served as a delegate to the South Carolina convention that ratified the Constitution in 1788. James Madison, who served with Ramsay in the Continental Congress, was aware of the book. Ramsay's account of grievances leading to the Revolution was apropos, particularly in regard to what became the Second Amendment.

The Founders' Second Amendment, at 85-86 (footnotes omitted).

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(4). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(g)(4) to "confront" the "perceived societal problem" posed by individuals with mental illness or a history of the mentally ill possessing firearms. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(4) "[i]s unconstitutional." *Id.*

---

8 https://www.washingtonpost.com/archive/opinions/1995/05/31/when-the-redcoats-confiscated-guns/e38d0810-af85-4949-8d93-3da746601e65/ (last viewed December 5, 2022).

### G. *Heller*'s statements about "presumptively lawful regulatory measures" and "law-abiding, responsible citizens" do not require a different conclusion.

Movant expects the government will attempt to sidestep the straightforward *Bruen* analysis of Section 922(g)(4) by falling back on two passages from *Heller* that supposedly place "mental incompetents" or "lunatics" outside the protection of the Second Amendment. In the government's view, these passages would deem involuntary commitment disarmament laws "presumptively lawful" and limit Second Amendment rights to "law-abiding, responsible citizens." Neither passage justifies ignoring *Bruen*'s clear command. *See e.g.* *United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240 (5th Cir. 2023). The first was *dicta* and, in any event, has been superseded by the new *Bruen* framework; the second establishes a constitutional baseline that protects, rather than limits, Second Amendment rights. These passages cannot save Section 922(g)(4).

#### 1. "Presumptively lawful regulatory measures"

After completing its historical survey, and before assessing the constitutionality of the District of Columbia's statutes, the Court in *Heller* inserted some "precautionary language." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc). The Court wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. It then added the language movant expects the government to cite in this case:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court wrote, "[w]e identify these *presumptively* lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26 (emphasis added).

In other cases, the government has argued this portion of *Heller* definitively establishes that involuntarily commitment disarmament laws are consistent with the Second Amendment. That view is incorrect. The question of involuntary commitment-disarmament laws' constitutionality was not before the Court in *Heller*, and any statements in the opinion addressing that question are therefore "dicta." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *see also, e.g.*, *Tyler*, 837 F.3d at 686-87 (describing *Heller*'s "presumptively lawful" language as "dictum"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same); *United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (characterizing "presumptively lawful" language as "the opinion's *deus ex machina* dicta"). The result is that, as the *en banc* Seventh Circuit has explained, the passage cited above should not be treated as a holding:

> The language we have quoted warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that

> the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court's disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration.

*Skoien*, 614 F.3d at 640; *accord Tyler*, 837 F.3d at 687 (same).

Of course, lower courts should "give great weight to Supreme Court *dicta*," *N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), at least when the Court's opinion engages in an "extended discussion" of an issue, the Court gives "full and careful consideration to the matter," and the issue is "important, if not essential, to the Court's analysis," *Hengle v. Treppa*, 19 F.4th 324, 346-47 (4th Cir. 2021). Ultimately, however, lower courts "are not bound by *dicta* or separate opinions of the Supreme Court." *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). Where the Supreme Court's discussion of an issue is "peripheral" or "cursory," courts need not defer to it. *Hengle*, 19 F.4th at 347. The Fourth Circuit has therefore declined to follow Supreme Court *dicta* that is "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008); *see also id.* at 283 (refusing to "afford[] talismanic effect" to unexplained Supreme Court dicta). Other courts, too, disregard *dicta* for which the Supreme Court provides no reasoning or analysis. *See, e.g.*, *United States v. Montero-Camargo*, 208 F.3d 1122, 1132

n.17 (9th Cir. 2000) ("[W]e conclude that the brief dictum to which we allude should not dictate the result here."); *cf. Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (choosing to follow Supreme Court dicta because it was "not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta").

*Heller*'s discussion of "presumptively lawful regulatory measures" is exactly the kind of Supreme Court *dicta* which is not entitled to "talismanic effect." *In re Bateman*, 515 F.3d at 283. It was "unaccompanied by any analysis," *id.*, and was—at best—"peripheral" to the questions at issue in that case, *Hengle*, 19 F.4th at 347. The *Heller* Court provided no "extended discussion" of felon-disarmament laws. *Hengle*, 19 F.4th at 346. While the Court described felon-disarmament laws as "longstanding," 554 U.S. at 626, it "never actually addressed the historical pedigree" of those laws, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting). Indeed, the Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. The Court, in other words, did not even claim it had surveyed the relevant history and discovered a (robust but undisclosed) tradition of felon-disarmament laws dating back to the founding era. It simply asserted such laws were longstanding, and therefore presumptively lawful, "without any reasoning or explanation." Winkler, 56 U.C.L.A. L. Rev. at 1567; *see also United*

*States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("*Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons.").

But as explained above, permanent involuntary commitment disarmament laws are *not* longstanding—at least not in the sense that *Bruen* would use that term. It appears that no American jurisdiction enacted such a law until the 20th *Century, and Congress did not pass the federal statute at issue here until 1968*. *Heller*'s discussion of "longstanding" involuntary commitment disarmament laws, therefore, is not just *dicta*, but *dicta* based on a factually unsupportable premise. That is a slender reed on which to rest the categorical denial of an enumerated constitutional right. As the *en banc* Sixth Circuit has observed, absent "historical evidence conclusively supporting a permanent ban on the possession of guns" by felons, "it would be odd to rely solely on *Heller* to rubber stamp the legislature's power to permanently exclude individuals from a fundamental right…." *See Tyler*, 837 F.3d at 687 (applying this reasoning to 18 U.S.C. § 922(g)(4)'s prohibition of firearm possession by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution," which aligns with another category of laws *Heller* called "presumptively lawful"); *see also id.* ("Refusing to give

*Heller* conclusive effect in this case is particularly proper given § 922(g)(4)'s lack of historical pedigree.").

*Heller* itself indicates that its *dicta* should not control here. Dissenting in *Heller*, Justice Breyer criticized the reference to longstanding felon-disarmament laws as "*ipse dixit*," noting that the majority "fail[ed] to cite any colonial analogues" to such statutes. 554 U.S. at 721-22. The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. This rejoinder suggests the *Heller* Court assumed "felons can be deprived of the [Second Amendment] right *if that deprivation is consistent with history and tradition*." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020) (emphasis added). The Court's allusion to "expound[ing] upon the historical justifications" for felon-disarmament laws would make no sense if the Court believed felons could be disarmed *regardless* of whether history supported that exclusion.

And—crucially—the Court stressed that it had not canvassed the historical record and made a determination, one way or the other, about whether that record supported mentally ill disarmament laws. *Heller*, 554 U.S. at 626 ("[W]e do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment."). *Bruen*, in turn, affirmed that *Heller* did not purport to settle any

questions beyond those necessary to resolve the petitioners' claim in that case. 142 S. Ct. at 2128 (noting *Heller* described Second Amendment right as "not unlimited," but adding, "[t]hat said, we cautioned that we were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment' and moved on to considering the constitutionality of the District of Columbia's handgun ban"). It is therefore "particularly wrongheaded to read [*Heller*] for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 623.

Even more telling is *Heller*'s discussion of *Lewis v. United States*, 445 U.S. 55 (1980). The defendant in that case, who was convicted under the federal felon-in-possession statute, argued the prosecution violated his equal-protection rights because his underlying felony conviction had been secured in the absence of counsel. *Lewis*, 445 U.S. at 58, 65. The Court rejected that argument, reasoning that Congress "could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm." *Id.* at 66. In *Heller*'s words, the *Lewis* Court then "commented gratuitously, in a footnote," on a Second Amendment question that was not "raised or briefed by any party." 554 U.S. at 625 n.25. Specifically, the *Lewis* Court observed:

> These legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties. See *United States v. Miller*, 307 U.S. 174, 178, 59 S. Ct. 816, 818, 83 L.Ed. 1206 (1939) (the Second

> Amendment guarantees no right to keep and bear a firearm that does not have "some reasonable relationship to the preservation or efficiency of a well regulated militia"); *United States v. Three Winchester 30-30 Caliber Lever Action Carbines*, 504 F.2d 1288, 1290, n. 5 (CA7 1974); *United States v. Johnson*, 497 F.2d 548 (CA4 1974); *Cody v. United States*, 460 F.2d 34 (CA8), cert. denied, 409 U.S. 1010, 93 S. Ct. 454, 34 L.Ed.2d 303 (1972) (the latter three cases holding, respectively, that § 1202(a)(1), § 922(g), and § 922(a)(6) do not violate the Second Amendment).

445 U.S. at 65 n.8. The *Heller* Court went out of its way to make clear it was not bound by *Lewis*' interpretation of the Second Amendment, writing, "It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued." 554 U.S. at 625 n.25.

To accept, as the government is expected to argue, that *Heller* settled the constitutionality of involuntary commitment disarmament laws would be to do exactly what that case called "inconceivable": interpreting "the basic meaning" of the Second Amendment based on "a footnoted dictum in a case where the point was not at issue and was not argued." *See* 554 U.S. at 627 n.26 (describing felon-disarmament laws, in a footnote, as "presumptively lawful regulatory measures"). Indeed, treating *Heller*'s "presumptively lawful" language as binding would be especially ironic given that, in the footnote *Heller* disclaimed as *dicta*, *Lewis* suggested felon-disarmament laws do not violate the Second Amendment. *Lewis*, 445 U.S. at 65 n.8 (citing three court of appeals opinions to that effect).

Finally, even if the *Heller dicta* might once have warranted deference, it no longer does today. The Fourth Circuit has said lower courts need not follow Supreme Court *dicta* that has been "enfeebled by later statements" in other Supreme Court cases. *Hengle*, 19 F.4th at 347. That is the case here. It may be true that "nothing in [*Heller*] cast doubt on longstanding prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, but *Bruen*'s new framework plainly *does* cast doubt on such laws. As explained above, *Bruen* demands a "text-and-history" analysis that looks only to "the Second Amendment's plain text" and our "Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126, 2138. Neither of those sources provides any support for involuntary commitment disarmament laws. It is perhaps unsurprising, then, that the Court in *Bruen* did not repeat *Heller*'s *dicta* about "longstanding" and "presumptively lawful" involuntary commitment disarmament laws.

Rather than following historically unsupportable *dicta* from *Heller*, this Court should adhere to the binding framework supplied by *Bruen*. Elevating *Heller*'s *dicta* over *Bruen*'s holding would treat the Second Amendment right "as a second-class right," contrary to the Supreme Court's admonishment in *McDonald*. 561 U.S. at 780.

**2. "Law-abiding, responsible citizens"**

In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the

very *product* of an interest balancing by the people." 554 U.S. at 634-35 (emphasis in original). The result is that judges lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Based on this language, the government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms.

This argument plainly misreads *Heller*. The Court in *Heller* did not limit the Second Amendment right to law-abiding, responsible citizens. Rather, it said that, *at the very least*, such people are protected by the Second Amendment. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. The Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether—much less rule out the conclusion that—other people have that right, too.

*Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* dispelled the ambiguity. The passage cited above references law-abiding,

responsible citizens' right to use arms "in defense of hearth and home." *Id.* If that passage were meant to demarcate the outer limits of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms *outside* the home. But *Bruen* held the Second Amendment right does extend outside the home, 142 S. Ct. at 2134, and the Court in *Bruen* gave no hint that it believed it was contradicting what it said in *Heller*. Thus *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment. The Fifth Circuit has recently acknowledged the same. *See supra, Rahimi.*

*Heller* also used the word "law-abiding" during a discussion of the Court's opinion in *United States v. Miller*, 307 U.S. 174 (1939), which the District of Columbia cited to support its collective-rights view of the Second Amendment. The *Heller* Court wrote that it "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625. This reference to "law-abiding" citizens, like the last, does not suggest, much less hold, that *only* the law-abiding enjoy Second Amendment rights. As the *Heller* Court emphasized, *Miller* addressed "the *type of weapon[s]*" that are "eligible for Second Amendment protection"—which *Heller* explicitly contrasted with the question of the *type of people* who are eligible for Second Amendment protection. *Id.* at 622 (emphasis in original) (explaining *Miller*

did not turn on whether "the Second Amendment protects only those serving in the militia," but rather on "the character of the weapon" at issue in that case); *see United States v. Perez*, 6 F.4th 448, 451 (2d Cir. 2021) ("[*Heller*] considered the scope of the Second Amendment along two dimensions: what types of 'arms' are protected and who are among 'the people.'"). *Heller*'s use of the word "law-abiding," therefore, provides no support for the view that felons are unentitled to the Second Amendment's protection.

Movant recognizes that, at times, *Bruen* repeats *Heller*'s "law-abiding citizens" formulation. *E.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). But that is because the petitioners alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted *certiorari* to decide only whether "New York's denial of *petitioners'* license applications violated the Constitution." *Id.* at 2124-25 (emphasis added). No other questions were before the Court in *Bruen*. *Heller*'s description of the right to bear arms "in the home" does not mean the Second Amendment is inapplicable to other *places*, and the same is true here: *Bruen*'s description of "law-abiding citizens" does not mean the Second Amendment is inapplicable to other *people*.

If *Bruen* excluded the non-law-abiding from the Second Amendment, the opinion would suffer from hopeless internal inconsistency. *Bruen*'s central lesson is that history is paramount in Second Amendment interpretation—a point the Court made over and over again. *See, e.g.*, *id.* at 2127 ("[*Heller*] demands a test rooted in the Second Amendment's text, as informed by history."); *id.* ("[*Heller*] looked to history because 'it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right.'" (emphasis in original)); *id.* at 2128-29 ("*Heller*'s methodology centered on constitutional text and history."); *id.* at 2129 (describing means-ends balancing as "inconsistent with *Heller*'s historical approach"); *id.* at 2130 (likening Second Amendment to First because, in both instances, "to carry [its] burden, the government must generally point to *historical* evidence about the reach of the [amendment's] protections" (emphasis in original)); *id.* ("And beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims."); *id.* at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id.* at 2135 ("[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation."); *id.* at 2138 ("We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause

requirement. Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional."); *id.* at 2145 ("Thus, all told, in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry.").

Yet as explained above, the historical record provides no support whatsoever for involuntary commitment disarmament laws. The government's position would have this Court hold, based solely on the implication from a negative inference unnecessary to *Bruen*'s holding, that the question of whether non-law-abiding citizens can possess firearms is—uniquely among all issues of Second Amendment interpretation—exempt from the requirement that the amendment's scope be firmly rooted in history. Nothing in *Bruen* permits that result.

A final critical problem with limiting Second Amendment protections to only "law abiding citizens" is that neither the Constitution nor the Supreme Court have defined who, what, when or where "law abiding citizens" actually are. Is a jay walker not protected by the Second Amendment? Citizens cited for disobeying parking ordinances or speeding? Citizens caught fishing without the required license? Citizens who are late paying their taxes? Citizens who did not return a library book for ten years? Citizens attending a rally espousing a dissenting viewpoint from a particular government

policy? Citizens "parading" as post-*Dodd*'s protesters did around Justices Alito's, Kavannah's, and Barrett's homes? Black Lives Matter and Antifa protesters looting and burning businesses in Minneapolis? Citizens attending a January 6, 2021 rally, who remained outside the capital and did nothing to capital police officers? Where does the categorical citizen disarmament properly start, and where does it end – when Second Amendment protections ONLY apply to some amorphous category of undefined perfect "law abiding citizens"? The fundamental right protected by the Second Amendment cannot be so arbitrarily constrained.

## IV. CONCLUSION

Applying *Bruen*'s standard, Gould's possessing a shotgun was conduct protected by the Second Amendment, such that a presumption of unconstitutionality applies to Section 922(g)(4). Firearm violence by the mentally ill was a societal concern which could have been addressed by permanent citizen disarmament in 1791, but was not. The United States will not be able to point to any distinctly similar historical tradition of firearm regulation that would rebut Bruen's presumption that Section 922(g)(4) is unconstitutional. This Court, therefore, should dismiss defendant's indictment with prejudice.

The Court's current scheduling order, among other things, set the parties' pretrial motion deadline for February 13, 2023. Relative to consideration of the merits of his *Bruen* motion to dismiss, defendant asks that the parties' requirements to file other motions as well as to meet other stated pretrial deadlines be suspended

pending the Court's full disposition of his motion. Defendant submits that the time devoted for that purpose would be excludable time under the Speedy Trial Act.

Date: February 17, 2023.

Respectfully submitted,

**JAMES GOULD**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/ Lex A. Coleman**
Lex A. Coleman, WV Bar No. 10484
Senior Litigator, AFPD
300 Virginia Street, East, Room 3400
Charleston, West Virginia 25301
Telephone: (304) 347-3350
Facsimile: (304) 347-3356
E-mail: lex_coleman@fd.org