IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.                                                    CRIMINAL NO.  2:22-cr-00095

JAMES GOULD

RESPONSE OF THE UNITED STATES IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS

Defendant James Gould ("Gould") has filed a motion to dismiss the indictment.  ECF No. 40.  The defendant does not dispute any of the facts alleged in the indictment.  He argues the indictment charging him with being a prohibited person in possession of firearm in violation of 18 U.S.C. § 922(g)(4) is unconstitutional after the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

Gould's claim regarding the § 922(g)(4) charge fails because the Second Amendment's protections do not extend to those who have been adjudicated as a mental defective or have been committed to a mental institution.  Even if the aforementioned statute did regulate protected conduct, it would still be constitutional because it is consistent with the nation's historical tradition of firearm regulation.  Thus, Gould's motion to dismiss should be denied.

I.       LEGAL BACKGROUND

         a.  Statutory Regulations on Firearm Possession

Section 922(g)(4) makes it unlawful for any person who "has been adjudicated as a mental defective or has been committed to any mental institution" to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive

any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(4).

### b.  The Second Amendment

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court recognized that the Second and Fourteenth Amendments protect the right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense.  The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable and so unavailable for self-defense.  *Id.* at 628–34.

"Like most rights," however, *Heller* emphasized that "the right secured by the Second Amendment is not unlimited."  *Id.* at 626.  It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.  Heller* made clear that the opinion should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626-27; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010).  *Heller* described these regulations as "presumptively lawful" measures. 554 U.S. at 627 n.26.

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in *Heller* more explicit."  142 S.Ct. at 2134.  It clarified the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess and carry

guns for self-defense: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. Only after the government makes that showing "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130.

In announcing the test to be used for determining whether the Second Amendment has been infringed, *Bruen* did not alter *Heller's* conclusion that rights under the Second Amendment can be limited. The Justices who made up the majority understood the opinion to "decide[] nothing about who may lawfully possess a firearm." *Id.* at 2157 (Alito, J., concurring). Justice Kavanaugh, in his concurrence, was more explicit. He recognized that "the Second Amendment allows a 'variety' of gun regulations" and the Court's decision was not meant to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 2162 (Kavanaugh, J., concurring) (internal citations omitted).

Applying its more explicit standard of review, the Court held unconstitutional a New York licensing law that allowed an applicant to obtain a license to carry a gun outside his home only upon proving "proper cause exists." *Id.* at 2123. First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 2134.[1] This, the Court concluded, fell within "the right to keep and bear arms." *Id.*

---

[1] That the individuals were "law-abiding," but still required to demonstrate a special need appears to have been the Supreme Court's primary issue with the New York law. *See generally, id.*.

The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th-century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

*Bruen* rejected the means-end scrutiny framework most courts had relied upon to assess the constitutionality of gun regulations. *Id.* at 2127. But it did not, as Gould claims, invalidate § 922(g)(4). Nor did it entirely abrogate the Fourth Circuit's post-*Heller* Second Amendment precedent. After *Heller*, the Fourth Circuit explained that, when determining whether a statute burdens conduct falling within the scope of the Second Amendment, a court should conduct "historical inquiry seek[ing] to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010), *abrogated on other grounds by Bruen*, 142 S.Ct. 2111 (quotation marks omitted). *Bruen* described such an inquiry as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." 142 S.Ct. at 2127. It also did not undermine the Fourth Circuit's earlier analysis of the historical tradition of firearms regulations. As explained below, a review of that history and of relevant caselaw compels the conclusion that § 922(g)(4) is constitutional.

4

## II.      SECTION § 922(g)(4) IS CONSTITUTIONAL.

Gould argues § 922(g)(4) is facially unconstitutional because its prohibitions are not deeply rooted in this country's history.  ECF No. 40.  He faces a heavy burden:  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Section 922(g)(4) proscribes the possession of firearms by those found mentally deficient or committed to a mental institution; as discussed below, this prohibition on possession of firearms by members of this group is not constitutionally protected as it involves conduct outside the scope of the Second Amendment.  Assuming he could show his conduct is protected, § 922(g)(4) would still be constitutional because the statute is consistent with the nation's longstanding historical tradition of disarming persons considered a risk to society, including the mentally ill.  The statute is constitutional, and Gould's motion to dismiss should be denied.

### A.  Gould's motion to dismiss the § 922(g)(4) charge should be denied because the Second Amendment does not extend to the possession of firearms by those adjudicated mentally defective and/or involuntarily committed.

Gould's facial challenge to the constitutionality of § 922(g)(4) is without merit.  First, Gould cannot show the Second Amendment right to keep and bear arms protects the prohibited conduct:  possession of a firearm by someone who has been adjudicated as a mental defective or has been committed to a mental institution.  Under the first step of the *Bruen* analysis, the text of the Second Amendment does not cover the right of those adjudicated mentally defective or committed to a mental institution to possess a firearm because they are not "responsible citizens." *Heller*, 554 U.S. at 635.  *Heller* emphasized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  *Heller*, 554 U.S. at 626.  Although the Court did "not undertake an

5

exhaustive historical analysis," it said that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* As *Heller* implicitly recognized, those individuals, like Gould, who have been involuntarily committed to a mental institution on multiple occasions are not responsible citizens with the same right to bear firearms as other citizens.[2] The Court described such prohibitions on possession of firearms by the mentally ill as "presumptively lawful" and falling within "exceptions" to the protected right to bear arms. *Id.* at 627 n.26, 635.

Regulations prohibiting the possession of firearms by the mentally ill are analogous to regulations prohibiting the possession of firearms by unlawful users of controlled substances. It should be uncontroversial that both classes consist of people who may present diminished mental capacity or impaired judgment.[3] *United States v. Yancy*, 621 F.3d 681, 685 (7th Cir. 2010) (observing "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms.").

---

[2] While the indictment only refers to his most recent July 30, 2019, involuntary commitment in Jackson County, West Virginia, Gould was also previously involuntarily committed in Jackson County on February 14, 2018 and June 28, 2019, and in Wood County, West Virginia, on May 12, 2016.

[3] Title 27 C.F.R. § 478.11(a), containing the companion regulations to Section 922, defines "mental defective" as those determined, "as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease: (1) [i]s a danger to himself or to others; or (2) [l]acks the mental capacity to contract or manage his own affairs." The Code defines that an "unlawful user of or addicted to any controlled substance" as "[a] person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician." 27 C.F.R. § 478.11(a).

6

Evaluating Second Amendment challenges to gun regulations requires courts to make a "threshold inquiry" into whether the conduct regulated "fall[s] within the scope of the Second Amendment's guarantee." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  Here, that inquiry proves dispositive because, as both *Heller* and history make clear, people suffering from significant mental illness do not possess Second Amendment rights.

Colonial society at the time of the founding did not view persons with mental illness as being among those who could bear arms without "real danger of public injury." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010).  "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry," which did not include individuals with a history of mental illness. *Yancey*, 621 F.3d at 684–85; see also Robert Dowlut, The Right to Arms: Does the Constitution or the Predilection of Judges Reign?, 36 OKLA. L. REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms]."). Such individuals were often removed from the community at large through home confinement or involuntary commitment to welfare and penal institutions. *See, e.g.*, Gerald N. Grob, The Mad Among Us: A History of the Care of America's Mentally Ill 5-21, 29, 43 (1994). Moreover, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad'" Carlton F.W. Larson, Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 HASTINGS L. J. 1371, 1377 (2009). These historical realities strongly suggest that the Framers did not understand the Second Amendment to guarantee those with mental illness the unqualified right to possess a firearm.

Critically, *Heller* held that the "longstanding prohibitions on the possession of firearms by felons and the mentally ill" comport with the Second Amendment, which only protects the "right

of law-abiding, responsible citizens" to possess a firearm. *Heller's* commentary is not mere dicta. *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010).

Indeed, the Supreme Court has repeatedly assured the presumptive validity of such laws under its Second Amendment holdings. *McDonald v. City of Chicago*, Ill., 561 U.S. 742, 786 (2010). *Bruen* did nothing to disturb the decision in *Heller*. It only reiterated that the Second Amendment "is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. Justice Kavanaugh, joined by Chief Justice Roberts in a concurring opinion, noted the "presumptively lawful regulatory measures" described in *Heller*, including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill. " *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

Moreover, Justice Kavanaugh's concurrence observed that *Bruen* only concerned "may-issue" licensing regimes. *Id*. It did not reach "shall-issue" licensing regimes—which commonly disqualify felons, the mentally ill, and drug users. *Id*. These regimes, Justice Kavanaugh suggests are likely constitutional. *Id*. ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.") (See West Virginia Code §§ 61-7-4 and 61-7-7 for obtaining a concealed weapons permit and prohibitions.) *Heller* makes clear that people who suffer from a significant mental illness may be disarmed consistent with the Second Amendment.  Moreover, although the passage is not conclusive on this point, it suggests that such people fall outside the scope of the Second Amendment altogether. *See United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (concluding that "[t]hese restrictions, as well as others similarly rooted in history, were left intact by the Second Amendment"); *Marzzarella*, 614 F.3d at 91 ("better reading" of the language in *Heller* is that it identifies "exceptions to the right to bear arms").

A historical analysis of the right to bear arms confirms this view.  In particular, from the time it originated in English law to the time of the Founding, the right to keep and bear arms was understood not to have extended to those citizens whose possession of them posed a danger to themselves or others.  *See Heller*, 554 U.S. at 635 (recognizing right of "law-abiding *responsible* citizens" to use firearms in the home for self-defense) (emphasis added); *Rene E.*, 583 F.3d at 15 (noting "a longstanding practice of prohibiting certain classes of individuals from possessing firearms – those whose possession poses a particular danger to the public").

*Heller* identified the right to arms recognized in the 1689 English Declaration of Rights as "the predecessor of our Second Amendment."  *Id.* at 593.  This document provided "[t]hat the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law." 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1698).  Moreover, even after adoption of the Declaration of Rights, lieutenants of the militia (appointed by the King) could and did disarm "any person or persons" judged "*dangerous to the Peace of the Kingdome*" under the 1662 Militia Act. 13 & 14 Car. 2, c. 3, § 1 (1662)(Eng.) (emphasis added).[4] *See* Joyce Lee Malcolm, *To Keep and Bear Arms*, 123 (Harvard Univ. Press) (1994); *accord* Patrick J. Charles, "*Arms for Their Defence*"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated In McDonald v. City of Chicago*, 57 Clev. State L. Rev. 351, 373, 376, 382-83, 405 (2009).

In the colonies, as well, governments frequently disarmed those perceived as dangerous, and such restrictions were not viewed as inconsistent with the right to bear arms. Malcolm, supra,

---

[4] By providing that Protestants could have arms "suitable to their conditions" and "as allowed by law," the Bill of Rights apparently provided a small minority of upper-class Protestants a right to arms via the Crown (but not Parliament).  Lois Schwoerer, *To Hold And Bear Arms: The English Perspective*, 76 Chicago-Kent L. Rev. 27, 43, 47-48, 59 (2000).

at 140-41; Robert J. Cottrol and Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Georgetown L.J. 309, 323-27 (1991). Colonial governments also used "Test Acts" to disarm persons who refused to swear a loyalty oath. Saul Cornell, *Commonplace or Anachronism: the Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 228-29 (1999); Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America*, 28-30 (2006). The adoption of these Acts demonstrated that the right to bear arms was viewed as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 671 (2002).

The documentary record surrounding adoption of the Constitution further confirms this view. Most significantly, the Pennsylvania anti-federalist faction offered the following proposal at the Pennsylvania Convention:

> That the people have a right to bear arms for the defense of themselves and their own state or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, *unless for crimes committed, or real danger of public injury from individuals*;....
>
> > The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 Schwartz, *The Bill of Rights, A Documentary History* 665 (1971) (emphasis added).

The *Heller* Court found this Pennsylvania Minority proposal to be both "highly influential" and a "precursor[]" to the Second Amendment. *Heller*, 554 U.S. at 603-04.[5]

---

[5] Although the Second Amendment itself proved more "succinct[ ]" than this proposal, *Heller*, 554 U.S. at 659 (Stevens, J., dissenting), the latter remains probative of how the Amendment's supporters viewed the balance between public safety and the right to keep and bear arms. *See id.* at 605 (reaffirming that "the Bill of Rights codified venerable, widely understood liberties").

Nor was the Pennsylvania proposal an aberration.  In Massachusetts, Samuel Adams offered a similar amendment at the ratifying convention, recommending "that the said Constitution be never construed to authorize Congress * * * to prevent the people of the United States who are *peaceable citizens*, from keeping their own arms." Schwartz, *supra,* at 674-75, 681 (emphasis added).[6]  Although not identical to the Pennsylvania proposal, this formulation likewise reflected an understanding that arms could be denied to those whose inability to control their behavior threatened public safety.

Both of these proposals support the view that "[i]n classical republican political philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the 'virtuous citizen.'...One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children *or the mentally unbalanced*, are deemed incapable of virtue." Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)(emphasis added); *see* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1359-62 (2009); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 492 (2004); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 130 (1986).

---

[6] For contemporaneous definitions of "peaceable," *see* Johnson ("1. Free from war; free from tumult; 2. Quiet; undisturbed; 3. Not violent; not bloody; 4. Not quarrelsome; not turbulent"); Sheridan ("Free from war; free from tumult"); Noah Webster, American Dictionary of the English Language (1828) (definitions include "free from private feuds and quarrels;" and "quiet, undisturbed, not agitated with passion").

This historical backdrop confirms *Heller*'s suggestion that the right to keep and bear arms would not have extended at the Founding to persons suffering from significant mental illness. The lack of laws formally disarming such persons does not suggest otherwise.[7] Instead, it merely reflects a larger absence, in the "decentralized" and "rural" colonies, of "systematic policies" regarding the mentally ill. Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill*, 5, 13, 21 (1994).

During the colonial period, "[m]ental illness was perceived to be an individual rather than a social problem[.]" *Id.* at 5. Accordingly, families were largely expected to address it on their own, while protecting others from any resulting harm. *See generally*, *id.* at 5-21; Mary Ann Jimenez, *Changing Faces of Madness: Early American Attitudes and Treatment of the Insane*, 49 (1987). In cases where government involvement was needed, local officials responded on an "ad hoc" basis. Grob, *supra*, at 15; Jimenez, *supra*, at 57; Shomer S. Zwelling, *Quest for a Cure: The Public Hospital in Williamsburg, Virginia, 1773-1885*, 3 (1985) ("[T]he insane in Virginia were * * * dealt with by local officials in a haphazard and unsystematic fashion.").[8]

None of this suggests that significantly mentally ill persons had access to firearms, let alone a "right" to keep them. Instead, "disordered persons" who threatened public safety were dealt with harshly, by confining them in tiny rooms, cells or cages. Grob, *supra*, at 15-16; Jimenez, *supra*,

---

[7] Indeed, the lack of formal laws, despite so many references to the belief that the mentally ill should not possess firearms, suggests that it was presumed that such individuals fell outside the scope of those with any right to possess firearms, and thus formal laws regarding disarmament were simply unnecessary.

[8] Local justices of the peace had the power to seize arms involved in an "affray," *i.e.*, a public assault or fight. *See Conductor Generalis: Or The Office, Duty and Authority of Justices of the Peace*, 10, 12 (1788). Thus, if the family of a "disordered" person failed to prevent them from acquiring firearms, local officials likely could step in and remove them.

at 43, 92.  Clearly, this response obviated any general need to legislate against firearm possession by the mentally ill.  The historical record confirms *Heller*'s apparent conclusion that mentally ill individuals fall entirely outside the scope of the Second Amendment.  Gould was within that category of individuals when he possessed firearms on multiple occasions and committed the offense at issue here.

**B.  In the alternative, Gould's motion to dismiss the § 922(g)(4) charge should be denied because the statute is consistent with the nation's historical tradition of regulating and disarming persons considered a risk to society, such as the mentally ill.**

Statutes disarming persons considered a risk to society, such as the mentally ill, are well known to the American legal tradition.  Indeed, substantially greater restrictions on liberty than mere disarmament were permitted to protect the public from the mentally ill. In England, justices of the peace could lock up dangerous "lunatics" and seize their property to pay for the cost of securing them. *See The Origin of Insanity As A Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487 (1985) (citing Vagrancy Act of 1744, 17 Geo. 2, c. 5.).

Similarly, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009).  For example, an 18th century Connecticut law required authorities to confine to home or another suitable place "any distracted or lunatic Person . . . who is dangerous and unfit to be without restraint," and if those responsible for the person "refuse[d] or neglect[ed] to confine" the person, then the authorities were to "take all proper and effectual measures" to keep the person "from going at large," including committing him "to the Gaol in that County where he or she dwells." 1 Acts and Laws of the State of Connecticut, in America 236 (1796). In addition, as the Third Circuit recently reasoned, in a decision vacated on other grounds,

13

these severe restrictions on the liberty of the mentally ill made specific restrictions on firearm possession unnecessary at the time. *Beers v. Attorney General of the United States*, 927 F.3d 150, 157 (3d Cir. 2019), vacated, 140 S. Ct. 2758 (2020).

Moreover, a historical practice has existed generally of disarming people deemed to be dangerous, such as those unwilling to swear an oath of allegiance to the colonies or the states. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157-60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-08 (2004). The mentally ill who have been adjudicated a mental defective or who have been committed to an institution are exactly the kind of potentially dangerous people that have historically been excluded from possessing firearms. Thus, Section 922(g)(4) is consistent with that longstanding and analogous traditions of restricting firearm possession. Restrictions on the rights of those adjudicated mentally ill or involuntarily committed to a mental institution are therefore constitutional under *Bruen*. As such, Gould's claim that § 922(g)(4) unconstitutionally infringes on a Second Amendment right should be denied.

## III. CONCLUSION

*Heller* and *Bruen* are clear that the Second Amendment protects possession and use of firearms for lawful purposes by law-abiding, responsible citizens. The Constitution does not protect the conduct § 922(g)(4) prohibits: possession of a firearm by a person who has been adjudicated as a mental defective or has been committed to any mental institution. Moreover, even if such conduct was covered by the Second Amendment, the statute is consistent with the nation's

historical tradition of firearm regulation with respect to the mentally ill.  The statute is facially

constitutional, and Gould's motion to dismiss should be denied.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

By:      */s/ Timothy D. Boggess*
TIMOTHY D. BOGGESS
Assistant United States Attorney
West Virginia Bar No. 6768
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone:  304-345-2200
Fax: 304-347-5104
Email:  Timothy.Boggess@usdoj.gov

15

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "RESPONSE OF THE UNITED STATES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS" has been electronically filed and service has been made on all counsel of record this the 17th day of March, 2023 upon:

> Lex Coleman, AFPD
> United States Courthouse, Room 3400
> 300 Virginia Street East
> Charleston, West Virginia 25307

> */s/ Timothy D. Boggess*
> TIMOTHY D. BOGGESS
> Assistant United States Attorney
> WV Bar No. 6768
> 300 Virginia Street, East
> Room 4000
> Charleston, WV 25301
> Telephone:  304-345-2200
> Fax: 304-347-5104
> Email:  Timothy.Boggess@usdoj.gov