**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                 CRIMINAL ACTION NO. 2:22-cr-00095

JAMES GOULD,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant James Gould's ("Defendant") *Bruen*-Based Motion to Dismiss.  (ECF No. 40.)  For the reasons discussed below, the motion is **DENIED**.

*I.  BACKGROUND*

For nearly a decade, Defendant struggled with his mental health so much that he was involuntarily committed to treatment facilities four separate times.  He was first involuntarily committed on May 12, 2016.  (ECF No. 43 at 6 n.2.)  Then, he was again involuntarily committed on February 14, 2018.  (*Id.*)  Shortly after that, on June 28, 2019, Defendant was committed for a short-lived third time.  (*Id.*)  Finally, Defendant was committed one more time on June 30, 2019.  (*Id.*)

Because of these involuntary commitments, Defendant was prohibited from possessing firearms under federal and state law.  Yet in April 2019 and again in November 2020, Defendant was charged with unlawfully possessing a firearm under state law.  (ECF No. 24 at 6–7.)  He pleaded guilty to the 2019 offense, but the 2020 charge was dismissed.  (*Id.*)

1

Defendant's habitual involuntary commitments and firearm violations intertwine with his turbulent relationship with his family.   For instance, on June 4, 2019, a domestic violence emergency protection order was filed against Defendant by his wife and children, shortly before Defendant was involuntarily committed on June 28, 2019.   (*Id.* at 2.)   Then, on October 16, 2021, Defendant was charged with two counts of domestic battery and one count for brandishing a deadly weapon.   (*Id.* at 7.)   Although those charges were dropped, (*id.*), his wife and children filed another domestic violence emergency protection order against him on October 22, 2021, (*id.* at 2). Defendant's wife filed a final domestic violence emergency protection order against him on April 13, 2022, (*id.*), and, just seven days later, Defendant was arrested on April 20, 2022, for four violations of the protective order, (*id.* at 8).   On March 24, 2022,[1] he pleaded guilty to one count, and the other three counts were dismissed.   (*Id.*)

Shortly before the final protective order was filed, though, Defendant was found in possession of a Remington, 11-87, 12-gauge shotgun on February 18, 2022.   (ECF No. 1.) Defendant was then indicted by a federal grand jury on May 3, 2022, and arrested on August 23, 2022, for unlawfully possessing a firearm in violation of 18 U.S.C. §§ 922(g)(4), 924(a)(2).   (ECF Nos. 1, 19.)   However, on June 23, 2022—after Defendant's indictment was returned, but prior to his arrest—the Supreme Court of the United States rendered its decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

On February 17, 2023, Defendant filed the pending motion to dismiss, arguing that *Bruen* invalidated § 922(g)(4).   (*See* ECF No. 40.)   The United States filed a response on March 17, 2023.[2]   (ECF No. 43.)   As such, this motion is fully briefed and ripe for adjudication.

---

[1] On the same day, Defendant pled guilty to driving under the influence, for which he was arrested on January 3, 2022.

[2] Although Defendant was not afforded the opportunity to file a reply brief under the Local Rules of Criminal

## II.    LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12, the court should dismiss criminal charges in an indictment "where there is an infirmity of law in the prosecution[,]" such as when the statute charged is unconstitutional.   *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). Typically, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."   *United States v. Salerno*, 481 U.S. 739, 745 (1987).   However, the Supreme Court has made clear that the Government carries the burden in Second Amendment cases.   *See Bruen* 142 S. Ct. at 2130.

After the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), courts applied the two-part test developed by circuit courts, including the Fourth Circuit, to Second Amendment challenges.   Under that test, courts conducted a historical inquiry into whether a law regulated conduct within the scope of the Second Amendment, then conducted an intermediate scrutiny analysis to evaluate the fit between the law and the governmental objective.   *United States v. Chester*, 628 F.3d 673, 680–83 (4th Cir. 2010).   This intermediate scrutiny analysis determined whether the state's interest in the regulation was sufficient to overcome whatever burden the law placed on one's Second Amendment right. *See, e.g.*, *United States v. Carter*, 669 F.3d 411 (4th Cir. 2012).

In *Bruen*, however, the Supreme Court determined that the lower courts had been incorrect in applying this "means-end scrutiny" test because it was inconsistent with the Second

---

Procedure, *see* L.R. Cr. P. 12.1, he took it upon himself to file one almost a month later on April 13, 2023, (ECF No. 48).   This is far beyond typical response/reply deadlines set forth in the local rules, but the Court will consider it nonetheless.

3

Amendment, and the appropriate methodology centers on the "constitutional text and history." *Bruen*, 142 S. Ct. at 2127–29.   The Court articulated that the proper standard is as follows:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–2130 (quoting *Koningsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Phrased another way, this test has two steps.   The first step is determining whether the plain text of the Second Amendment covers the conduct at issue.   *Id.* at 2129, 2134–35.   The second step is determining whether the Government has established the regulation is consistent with the historical tradition of firearms regulation in the United States.   *Id.* at 2129–30.

## III.   DISCUSSION

On March 30, 1981, John W. Hinckley, Jr. attempted to assassinate then-President Ronald Reagan.   *Hinckley v. United States*, 163 F.3d 647, 648 (D.C. Cir. 1999).   During his criminal trial, a jury found Hinckley not guilty by reason of insanity.   *Id.*   He was then involuntarily committed to St. Elizabeth's Hospital in 1982, *id.*, until his release in June 2022, *United States v. Hinckley*, No. CR 81-306 (PLF), 2021 WL 8200009, at *4 (D.D.C. Sept. 30, 2021).

Because he has been involuntarily committed, Hinckley—like Defendant—cannot possess a firearm under 18 U.S.C. § 922(g)(4).   However, Defendant argues that § 922(g)(4) is unconstitutional under *Bruen*.   (ECF No. 40.)   Thus, Defendant claims full stop that he, Hinckley, and others like them who have been determined to be a danger to themselves or society, have a constitutional right to possess a firearm despite the danger they pose.   (*See id.*)   Even under *Bruen*'s more demanding standards, the Court disagrees.

4

A. *The plain text of the Second Amendment*

The first step of a Second Amendment challenge is deciding whether the regulated conduct falls within the scope of the Second Amendment's plain text.   *Bruen*, 142 S. Ct. at 2129–30.   The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."   In interpreting this text, courts are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning."   *United States v. Sprague*, 282 U.S. 716, 731 (1931).   "Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation."   *Heller*, 554 U.S. at 576–77.

The Supreme Court has explained that the operative clause of the Second Amendment— "right of the people to keep and bear Arms"—protects the right to possess a handgun in the home for self-defense.   *See Bruen*, 142 S. Ct. at 2122 (citing *Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)).   *Bruen* further clarified that the Second Amendment also protects such conduct outside of the home.   *Id.*

As to whose conduct is protected by this right, the Supreme Court has explained that the words "the people" in the Second Amendment "unambiguously refer[ ] to all members of the political community, not an unspecified subset."   *Heller*, 554 U.S. at 580 (stating that "the people" "refer[ ] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community").   Based on this, *Heller* began its analysis with the "strong presumption that the Second Amendment

right is exercised individually and belongs to all Americans," *id.* at 581, and then confirmed that presumption, *id.* at 595.

Still, the *Heller* Court made clear that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. Specifically, the *Heller* Court cautioned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* The Court went so far as to say that such prohibitions are "presumptively lawful regulatory measures." *Id.* at 626-27 n.26. The Court's assurances on these prohibitions' presumptive constitutionality confirm that the Second Amendment is not an absolute barrier to congressional regulation of firearms and that some categorical prohibitions are assumed to be constitutional. *See United States v. Carter*, 669 F.3d 411, 420–21 (4th Cir. 2012). However, in making this observation, the Court expressly noted that it was not "clarify[ing] the entire field" of the Second Amendment, and the Court reserved for later cases an exploration of the historical justifications for its enumerated prohibitions. *Heller*, 554 U.S. at 635.

In this case, the Government contends that the Second Amendment does not cover the right of those adjudicated mentally defective or committed to a mental institution to possess arms. (ECF No. 43 at 5.) For support, the Government argues that "*Heller* held that the 'longstanding prohibitions on the possession of firearms by felons and the mentally ill' comport with the Second Amendment, which only protect the 'right of law-abiding, responsible citizens' to possess firearms." (*Id.* at 7–8.) Conversely, Defendant asserts that (1) the Supreme Court's reference to "law-abiding, responsible citizens" does not limit the scope of the Second Amendment, and (2) *Heller*'s "presumptively lawful" language is dicta.[3] (ECF No. 40 at 25.) Each of these

---

[3] Defendant also emphasizes that the first step of *Bruen* only asks whether the Second Amendment covers the *conduct* at issue without regard to the actor. (*See*, *e.g.*, ECF No. 40 at 9 ("That standard directs courts to begin by asking

arguments is discussed below.

1. "Law-abiding, responsible citizens"

When discussing the Second Amendment's scope, *Heller* referred to "law-abiding, responsible citizens."   *See* 554 U.S. at 635.   *Bruen* echoed *Heller*, also referring to "ordinary, law-abiding citizens" throughout the opinion.   *See* 142 S. Ct. at 2122, 2131, 2133, 2156.

Based on this language, the Fourth Circuit has interpreted the Second Amendment as covering only "law-abiding" citizens.   *See United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012) (stating that "the scope of the Second Amendment does not extend to provide protection to illegal aliens, because illegal aliens are not law-abiding members of the political community"). In *Bruen*'s wake, other district courts in the Fourth Circuit have continued to understand the Supreme Court's reference to "law-abiding" citizens as limiting the scope of the Second Amendment.   *See United States v. Medrano*, No. 3:21-CR-39, 2023 WL 122650, at *3 (N.D. W. Va. Jan. 6, 2023) (collecting cases); *see also United States v. Jackson*, No. CR ELH-22-141, 2023 WL 2242873, at *7 (D. Md. Feb. 27, 2023) (collecting cases from other circuits).   In fact, this Court recently referenced this language in rejecting a post-*Bruen* challenge to the constitutionality of §§ 922(g)(9) and 924(a)(2).   *See United States v. Nutter*, -- F.Supp.3d ---, No. 2:21-CR-00142, 2022 WL 3718518, at *7–8 (S.D. W. Va. Aug. 29, 2022) (Berger, J.) (underscoring the importance of "the Supreme Court's repeated invocation of 'law-abiding citizens' in its recent Second Amendment jurisprudence," and finding support in the historical tradition for laws prohibiting certain categories of persons from possessing firearms in the interest of public safety).

---

whether the Second Amendment's plain text covers an individual's <u>conduct</u>. If it does, then the Constitution presumptively protects that <u>conduct</u>." (internal quotation marks and citations omitted) (emphasis in original)); ECF No. 48 at 2–3 (similarly emphasizing "conduct").)

Now, similarly drawing on the reference to "responsible citizen[s]," the Government argues that individuals like Defendant "who have been involuntarily committed to a mental institution on multiple occasions are not responsible citizens with the same right to bear arms as other citizens."  (ECF No. 43 at 6.)  Defendant counters that neither the Constitution nor the Supreme Court have defined the category of "law-abiding, responsible citizens."  (*See* ECF No. 40 at 38–39.)  While Defendant questions the scope of the meaning of a "law-abiding" citizen, (*see id.* ("Is a jay walker not protected by the Second Amendment?")), a more difficult question is who constitutes a "responsible" citizen?

Further, Defendant argues that the Supreme Court's reference to "law-abiding, responsible citizens" "establishes a constitutional baseline that protects, rather than limits, Second Amendment rights."  (ECF No. 40 at 25.)   For support, Defendant cites to a Fifth Circuit opinion that has been withdrawn and superseded.  (*See id.* at 35 (citing *United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240 (5th Cir. 2023).)   Nevertheless, the Fifth Circuit's superseding opinion is enlightening.  *See United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023).

The *Rahimi* Court acknowledged that there is "some debate over the extent" that *Heller*'s "qualifier constricts the Second Amendment's reach."  *Rahimi*, 61 F.4th 451.  "As summarized by now-Justice Barrett, 'one [approach] uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.'"  *Id.* at 451 (citing *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J. dissenting), *abrogated by Bruen*, 142 S. Ct. 2111).  An argument that certain individuals fall outside the Second Amendment because they are not law-abiding, responsible citizens "rests on the first approach," but "runs headlong into *Heller* and *Bruen*, which . . . espouse the second

[approach]." *Id.* Thus, "in context, *Heller* simply uses 'law-abiding, responsible citizens' as shorthand in explaining that its holding—that the amendment codifies an individual right to keep and bear arms—should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . ..'" *Id.* The Government's argument, which focuses on the history of constitutional legislation that prohibited certain subsets of the community from possessing firearms, (ECF No. 43 at 7–13), supports this understanding.

Thus, the resolution of this issue rests upon *Heller*'s "presumptively lawful" language, which is addressed below.

2. "Presumptively lawful regulatory measures"

Defendant categorizes the Supreme Court's "presumptively lawful" language as dicta and urges the Court to disregard it, (ECF No. 40 at 25)—a proposition the Government disputes, (ECF No. 43 at 8 ("*Heller*'s commentary is not mere dicta."). This Court has addressed this question before and consistently found that "much of the language quoted by the Court in [*Heller* and *Bruen*, both in the majority and the concurring opinions, is dicta." *See United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *7 (S.D. W. Va. Oct. 12, 2022) (Goodwin, J.); *see also United States v. Tooley*, 717 F. Supp. 2d 580, 585 (S.D. W. Va. 2010) (Chambers, J.), *aff'd*, 468 F. App'x 357 (4th Cir. 2012); *United States v. Smith*, 742 F. Supp. 2d 855, 859 (S.D. W. Va. 2010) (Johnston, J.). Further, it is axiomatic that courts are "not bound by dicta or separate opinions of the Supreme Court." *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 406 (4th Cir. 2005).

Nevertheless, the Fourth Circuit has repeatedly instructed that courts should "afford substantial, if not controlling deference to dicta from the Supreme Court," "particularly when the supposed dicta is recent and not enfeebled by later statements." *Hengle v. Treppa*, 19 F.4th 324,

9

347 (4th Cir. 2021) (internal citations omitted) (noting that "[t]he lengthy discussion of alternative remedies . . . was important, if not essential, to the Court's analysis"); *Manning v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (recognizing the importance of relying on dicta when "grappling with complex legal questions of first impression . . . so as to ensure consistent and uniform development and application of the law"); *McCravy v. Metro. Life. Ins. Co.*, 690 F.3d 176, 181 n.2 (4th Cir. 2012) ("[W]e cannot simply override a legal pronouncement endorsed just last year by a majority of the Supreme Court.").   On the other hand, the Fourth Circuit has declined to follow Supreme Court dicta that is "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning."   *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008).

In this case, *Heller*'s "presumptively lawful" language has not been "enfeebled by later statements."   *Hengle*, 19 F.4th at 347.   In fact, it was reinforced two years later in *McDonald*, 561 U.S. at 786 (quoting *Heller*), and again *just last year*, in *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (same).   Additionally, the constitutionality of § 922(g)(4) in *Bruen*'s wake is certainly a "complex legal question of first impression."   *Caldwell*, 930 F.3d at 281.

On top of that, the Fourth Circuit has already relied on *Heller*'s "presumptively lawful" language to resolve facial constitutional challenges to § 922(g).   In *U.S. v. Moore*, 666 F.3d 313 (2012), the Fourth Circuit—citing *Heller*'s "presumptively lawful" language—concluded with "no difficulty" that § 922(g)(1)—which prohibits individuals "convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" from possessing a gun—did not violate the Second Amendment on its face.   *Id.* at 316–19 (explaining that the Supreme Court's identification of "longstanding prohibitions on the possession of firearms by felons [and the mentally ill]" as presumptively lawful "streamlined" the otherwise-applicable two-pronged

analysis).   In fact, almost every federal court of appeals has relied on the "presumptively lawful"

language in *Heller* and *McDonald* and held that § 922(g)(1) does not facially violate the Second

Amendment.   *See United States v. Bogle*, 717 F.3d 281, 281–82 (2d Cir. 2013) (per curiam);

*United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011), *overruled on other grounds by Binderup

v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc); *Moore*, 666 F.3d at 318–19; *United States v.

Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *United States v. Khami*, 362 F. App'x 501, 508 (6th

Cir. 2010), *cert. denied*, 560 U.S. 934 (2010); *United States v. Davis*, 406 F. App'x 52, 53–54 (7th

Cir. 2010); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Smith*, 329

F. App'x 109, 110–11 (9th Cir. 2009); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir.

2009), *cert. denied*, 559 U.S. 970 (2010); *United States v. Battle*, 347 F. App'x 478, 480 (11th Cir.

2009) (per curiam); *Schrader v. Holder*, 704 F.3d 980, 989–91 (D.C. Cir. 2013), *cert. denied*, 571

U.S. 989 (2013);

Following *Moore*, the Fourth Circuit has consistently upheld the facial constitutionality of

§ 922(g)(1) and other provisions of § 922(g) based at least in part on *Heller*'s "presumptively

lawful" language.[4]   *See, e.g.*, *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) (§

922(g)(1)); *United States v. Izaguirre–De La Cruz*, 510 Fed.Appx. 233, 234 (4th Cir. 2013) (§

922(g)(5)); *United States v. Larson*, 502 Fed.Appx. 336, 339 (4th Cir. 2013) (§ 922(g)(8)).   Of

relevance, the Fourth Circuit relied on *Heller*'s dicta to affirm the constitutionality of § 922(g)(4).

*United States v. McRobie*, No. 08-4632, 2009 WL 82715, at *1 (4th Cir. Jan. 14, 2009)

---

[4] Defendant cites a Fourth Circuit case criticizing this approach that "treat[s] *Heller*'s listing of 'presumptively lawful
regulatory measures[ ]' . . . as a kind of 'safe harbor.'"   (ECF No. 40 at (citing *United States v. Chester*, 628 F.3d
673, 679 (4th Cir. 2010).   But the "safe harbor" analysis that the Fourth Circuit was criticizing in *Chester* is an
approach that some courts have used to evaluate laws that are "unlisted" in *Heller*'s "presumptively lawful" passage,
such as Section 922(g)(9)'s dispossession of domestic-violence misdemeanants.   *Id.* at 679.   Whereas "prohibition[
] on the possession of firearms by . . . the mentally ill," *Heller*, 554 U.S. at 626, is "specifically listed in *Heller*,"
*Chester*, 628 F.3d at 679.

(unpublished) ("While the *Heller* opinion recognized a Second Amendment right for citizens to bear arms, it specifically cautioned that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill.'" (citing *Heller*)).   However, unpublished opinions are "entitled to only the weight they generate by the persuasiveness of their reasoning," *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 219 (4th Cir. 2006), and *McRobie* lacks any analysis or reasoning.

While *Bruen* abrogated some of these cases to the extent they employed means-end scrutiny, *Bruen* does not question the "longstanding regulatory measures" declared presumptively lawful in *Heller* and *McDonald*.   Importantly, the *Bruen* Court characterized its decision as "ma[king] the constitutional standard endorsed in *Heller* more explicit,"—not abrogating or overturning it.   *Bruen*, 142 S. Ct. at 2134.   In fact, two of the concurring opinions in *Bruen* emphasized the presumptively lawful regulations referenced in *Heller* and *McDonald*.   *See id.* at 2162 (Kavanaugh, J., concurring) (reiterating language from *Heller* and *McDonald* about "longstanding prohibitions on the possession of firearms by felons and the mentally ill"); *id.* at 2157 (Alito, J., concurring) (clarifying that the Court's holding did not "disturb[] anything that we said in *Heller* or *McDonald v. Chicago* . . . about restrictions that may be imposed on the possession or carrying of guns").   The dissent also viewed the majority opinion the same way, stating that it "understand[s] the Court's opinion today to cast no doubt on" *Heller*'s treatment of laws prohibiting firearm possession by felons and the mentally ill.   *Id.* at 2189 (Breyer, J., joined by Sotomayor, J., and Kagan, J., dissenting).   The Supreme Court's repeated emphasis on restraint and desire to avoid disturbing "presumptively lawful" regulations sounds a clarion call to lower courts to exercise the same caution to not apply the holdings of *Bruen*, *McDonald*, and *Heller* any

further than the Court itself did.

Moreover, since *Bruen*, many courts—including this Court—have relied on that presumption to uphold the constitutionality of various provisions of § 922(g).   *See Price*, 2022 WL 6968457, at *8 (collecting cases); *United States v. Riley*, No. 1:22-CR-163 (RDA), 2022 WL 7610264, at *9 n.9 (E.D. Va. Oct. 13, 2022) (collecting cases); *United States v. Robinson-Davis*, No. 7:22-CR-00045, 2023 WL 2495805, at *2 (W.D. Va. Mar. 14, 2023) (collecting cases); *see also United States v. Ingram*, No. CR 0:18-557-MGL-3, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022) (applying *Heller*'s presumptively lawful language to 21 U.S.C. §924(c)).   On this basis, courts across the country have deemed it unnecessary to engage in the historical analysis test articulated in *Bruen* as to § 922(g).   *See Price*, 2022 WL 6968457, at *9 (explaining that "the Supreme Court left generally undisturbed the regulatory framework that keeps firearms out of the hands of dangerous felons through its decision in *Bruen* by reaffirming and adhering to its reasoning in *Heller* and *McDonald*" and deeming it unnecessary to engage in the *Bruen* historical analysis test).   For so many courts to have systemically misunderstood the relevance and applicability of this language is unlikely.

Still, the Fourth Circuit recently acknowledged that relying on *Heller*'s dicta is a potentially faulty practice.   *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 415 n.6 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) ("Though we follow this framework, one might question relying on the list in *Heller* to carve out exceptions to the Second Amendment.").   Additionally, this Court was unable to find any post-*Bruen* district court decisions relying on *Heller*'s dicta to address § 922(g)(4), and none of the circuit courts that have addressed § 922(g)(4) have addressed a facial challenge or relied on *Heller*'s "presumptively

lawful" dictum.   *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 687 (6th Cir. 2016) (refusing to give *Heller* conclusive effect to an as-applied challenge); *Beers v. Attorney Gen. U.S.*, 927 F.3d 150, 158 (3d Cir. 2019), *cert. granted, judgment vacated sub nom. Beers v. Barr*, 140 S. Ct. 2758 (2020) (applying a two-part test to resolve an as-applied challenge); *Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020) (applying intermediate scrutiny to an as-applied challenge).

While some believe there is no reason to "us[e] a different approach to evaluate challenges to § 922(g)(4)," as opposed to other subsections of § 922(g), *see Tyler*, 837 F.3d at 715 (Moore, J., dissenting), several courts relied on *Heller*'s dicta for other subsections of § 922(g) based on the Supreme Court's "emphasi[s] that its holding applied to gun laws relating to 'law-abiding, [] citizens.'"   *See, e.g.*, *Riley*, 2022 WL 7610264, at *6 (analyzing § 922(g)(1) for felon in possession).   Those courts held that *Bruen* and its predecessors only "make[] clear that the Second Amendment protects the conduct of law-abiding citizens," but those cases "provide[] no constitutional sanctuary for those who use firearms to commit crimes."   *United States v. Snead*, No. 1:22-CR-033, 2022 WL 16534278, at *5 (W.D. Va. Oct. 28, 2022).

Indeed, *Heller*, *McDonald*, and *Bruen* all concern "a law-abiding citizen's right to armed self-defense." *see Bruen*, 142 S. Ct. at 2133.   Focusing on this fact, Defendant asserts that, unlike subsections of § 922(g) that concern individuals like felons, the Supreme Court's reference to the "mentally ill," was "peripheral to the questions at issue," and was "unaccompanied by any analysis," "extended discussion" on relevant disarmament laws, or "any reasoning or explanation." (ECF No. 40 at 28 (internal citations omitted).)   Defendant also points to *Heller*'s own discussion of dictum in a footnote of one of its previous decisions.   (*Id.* at 31–32 (citing 554 U.S. at 625 n.25 ("It is inconceivable that we would rest our interpretation . . . upon such a footnoted dictum in a

case where the point was not at issue and was not argued.")).)

Further, Defendant argues that while "nothing in *Heller* [or *Bruen*] cast doubt on longstanding prohibitions on the possession of firearms by felons . . . *Bruen*'s new framework plainly does cast doubt on such laws." (ECF No. 40 at 33 (internal citations omitted).)   It is true that "*Bruen* demands a 'text-and history' analysis that looks only to 'the Second Amendment's plain text' and our 'Nation's historical tradition of firearm regulation.'"   (*Id.* (quoting *Bruen*, 142 S. Ct. at 2138).)   Yet *Heller* did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," and even explicitly deferred an analysis of whether disarmament of the mentally ill had historical support.   *See Heller*, 554 U.S. at 626–27 n. 26.

Ultimately, the Court assumes without deciding that Defendant's conduct is protected by the Second Amendment.   Because this issue can be resolved under the second prong of *Bruen*, the Court will not pave a new road by definitively answering the first step but will instead take the "well-trodden and judicious course" of conducting an analysis to determine whether § 922(g)(4) "does burden conduct protected by the Second Amendment."   *See Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018) (quoting *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013)).   Further, "[w]hile courts may be free to 'presume' that many regulations (including those listed) will ultimately be declared lawful, it does not eliminate the need to conduct a careful constitutional analysis.   The Second Amendment, after all, is now clearly an important individual right, which should not be given short shrift."   *Tooley*, 717 F. Supp. 2d at 585.

### B.  Historical Basis

As to whether a challenged regulation has a historical basis, the Supreme Court explained that, "[i]n some cases, that inquiry will be fairly straightforward."   *Bruen*, 142 S. Ct. at 2131.   For

example, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Conversely, in "other cases," a challenged law will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Id.* at 2132. Historical inquiry into these unprecedented statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Id.*

As discussed below, there is a historical basis for upholding the constitutionality of § 922(g)(4). Prior to engaging with the second prong of the *Bruen* test, though, the Court must determine the proper standard and scope of review.

1. <u>The proper standard</u>

Defendant argues that the "distinctly similar standard" must be employed in determining whether § 922(g)(4) has a historical basis under the second prong of *Bruen*. (ECF No. 40 at 22.) He reasons that "[t]he societal problem Congress sought to address through Section 922(g)(4) was firearm violence by the mentally ill," which "existed in 1791 when the Second Amendment was ratified." (*Id.* (arguing that "this was not a problem that came about during the Twentieth century, that was unimaginable at the founding, or which arose from dramatic technological changes")). Although the Government did not respond to this argument, (*see generally* ECF No. 43), Defendant's claims raise two issues, which the Court will now address.

i.    Does *Bruen* create two different standards?

The first question is whether *Bruen* created different standards. The Court begins with a

review of *Bruen's* analysis.

      The Supreme Court began its reasoning with the following example:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.*, 142 S. Ct. at 2131.   Then, the Court used one of the challenged regulations in *Heller*—"totally banned handgun possession in the home"—as an illustration of this framework in action.   *Id.* (quoting *Heller*, 554 U.S. at 628).   After identifying the "perceived societal problem" as "firearm violence in densely populated communities," the Court determined that "the Founders themselves could have adopted" a flat ban on the possession of handguns.   *Id.*   Yet "after considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional."   *Id.* (quoting *Heller*, 554 U.S. at 631, 634).

      That mode of analysis is only for the straightforward cases, though.   The "other cases" "will often involve reasoning by analogy."   *Id.* at 2132.   Under this inquiry into unprecedented statutes, "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"   *Id.*   This standard is "neither a regulatory straightjacket nor a regulatory blank check." Instead, the standard "requires only that the government identify a well-established and representative historical analogue."   *Id.*   Further the challenged statute need not have a "historical

17

twin" or be a "dead ringer for historical precursors."  *Id.*   In this way, the Supreme Court sought only to avoid "endorsing outliers that our ancestors would never have accepted."  *Id.*

Further, although *Bruen* does not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it identified "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132-33. Sharpened even finer, there are two "central" considerations: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and (2) "whether that burden is comparably justified."  *Id.* at 2133.

When determining how to do this historical analysis, *Bruen*'s discussion of limitations on firearms in sensitive places is instructive.  The Court explained that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited . . . we are also aware of no disputes regarding the lawfulness of such prohibitions."  *Id.* at 2133.  "And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible."  *Id.*

On the one hand, *Bruen* could be read to create two different standards.  To start, the Supreme Court compared the "fairly straightforward" inquiry in "some cases," in which the societal problem existed at the time of the Founding Fathers, *id.* at 2131, with the "more nuanced approach" in "other cases," which addressed new issues, *id.* at 2132.  This seems to identify two separate inquiries.  Then, when discussing the first inquiry, the Court mentions "distinctly similar" historical regulations but only mentions "relevantly similar" historical regulations when discussing the second inquiry.  As such, some courts have applied a more stringent standard of

18

review for gun regulations aimed at societal ills dating to the Founding era.   *See e.g.*, *United States v. Holden*, 2022 WL 17103509, at *3 (N.D. Ind. Oct. 31, 2022); *United States v. Lewis*, 2023 WL 187582, at *4–5 (W.D. Okla. Jan. 13, 2023).

On the other hand, *Bruen* does not *require* a "distinctly similar" historical regulation under the first inquiry.   Instead, the Court provided several examples to guide courts, and "the lack of a distinctly similar historical regulation addressing that problem" was just one example of "relevant evidence" that the challenged law is unconstitutional.   *Bruen*, 142 S. Ct. 2131.   Importantly, the Court also seemed to endorse reasoning by analogy:   "[I]f some jurisdictions actually attempted to enact *analogous regulations* during this timeframe," which "were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality."   *Id.* (emphasis added).   In fact, when discussing *Heller* as an example, the Court recalled that, of all the "founding-era historical precedent" it considered, "none was *analogous* to the District's ban." *Id.* at 2131 (emphasis added).   Thus, under both inquiries, courts may use analogous reasoning.

Once again, though, the Court does not need to decide this issue either because, even if there are two standards, any such distinction does not help Defendant because clear historical precedent exists in this case as explained below.

ii.   <u>What is the proper "societal problem" to address?</u>

The second question is whether Defendant is correct in asserting—without any explanation—that the "societal problem" § 922(g)(4) seeks to address is "firearm violence by the mentally ill"?   Put simply, no.

Statutory interpretation starts with "the language of the statute itself."   *United States v. Weaver*, 659 F.3d 353, 356 (4th Cir. 2011).   "If the plain language is unambiguous, [a court] need

look no further." *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir.2015) (citation omitted). On the other hand, if the text of a statute is ambiguous, courts look to "other indicia of congressional intent such as the legislative history" to interpret the statute.  *Id.* (quoting *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 53 (4th Cir.2011)).   A court "determine[s] the 'plainness or ambiguity of statutory language . . . by reference to the language itself, . . . the specific context in which that language is used, and the broader context of the statute as a whole.'"  *Id.* (second and third alterations in original) (quoting *Yates v. United States*, 574 U.S. 528, 237 (2015)).   "A statute is ambiguous if it 'lends itself to more than one reasonable interpretation.'" *Id.* (quoting *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir.2004)).

In this case, Defendant's framing is far too broad for the simple reason that § 922(g)(4) does not prohibit just anyone with a mental illness from possessing a firearm.  *See* 18 U.S.C. § 922(g)(4).   Instead, it prohibits only individuals "who ha[ve] been *adjudicated as a mental defective* or who ha[ve] been *committed to a mental institution*" from possessing a firearm.  *Id.* (emphasis added).   In turn, "[a]djudicated as a mental defective"[5] is defined as follows:

> (a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:
>     (1) Is a danger to himself or to others; or
>     (2) Lacks the mental capacity to contract or manage his own affairs.

27 C.F.R. § 478.11.

Similarly, the definition of "committed to a mental institution" is a "[f]ormal commitment

---

[5] The Court notes that scholars and disability rights activists criticize the term "mental defective" for being offensive and vague.  *See, e.g.*, Jana R. McCreary, ''*Mentally Defective" Language in the Gun Control Act*, 45 CONN. L. REV. 813, 864 (2013) ("Continuing the use of a term over forty years old ignores the strides made in recognizing the importance of people and people-first language.").   It is used here only due to its statutorily enshrined status.

of a person to a mental institution by a court, board, commission, or other lawful authority," including "commitment to a mental institution involuntarily" and "commitment for mental defectiveness or mental illness" or "drug use."   27 C.F.R. § 478.11.

These definitions are largely coextensive, as a defendant who is committed to a mental institution by a court because he poses a danger to himself or others,[6] which is a criterion for commitment in nearly every state,[7] qualifies both under the first prong of "committed to a mental institution" and as being adjudicated as a "mental defective."   However, "committed to a mental institution" also captures a person who is committed "for other reasons, such as drug usage."   *Id.*

From these definitions, it becomes clear that § 922(g)(4) seeks to prevent a variety of groups from possessing firearms.   While possibly overlapping, the legal meanings of related concepts such as "marked subnormal intelligence,"[8] "mental illness,"[9] and "incompetency"[10] are

---

[6] Defendant takes great issue with the fact that West Virginia law allows for "involuntary commitment based only on a finding of probable cause."   (*See, e.g.*, ECF No. 48 at 2.)   However, nothing in his briefing or the Court's research suggests this issue is material for the present case in any way.

[7] Alaska Stat. Ann. § 47.30.755(a); Ariz. Rev. Stat. Ann. § 36-540(A); Cal. Welf. & Inst. Code § 5250; Colo. Rev. Stat. Ann. § 27-65-109(4); Conn. Gen. Stat. Ann. § 17a-498(c); Fla. Stat. Ann. § 394.467(1); Ga. Code. Ann. § 37-3-1(9.1); Haw. Rev. Stat. Ann. § 334-60.2; Idaho Code § 66-329(11); 405 Ill. Comp. Stat. Ann. 5/1-119; Ind. Code. Ann. § 12-26-6-8(a); Iowa Code Ann. § 229.1(20); Kan. Stat. Ann. § 59-2946(f); Ky. Rev. Stat. Ann. § 202A.026; La. Rev. Stat. Ann. § 28:55(E)(1); Mass. Gen. Laws. Ann. ch. 123, § 1; Mich. Comp. Laws Ann. § 330.1401.(1); Miss. Code Ann. §§ 41-21-73(4), 41-21-61(f); Mo. Ann. Stat. §§ 632.350(5), 632.005(10); Mont. Code Ann. § 53-21-126(1); Neb. Rev. Stat. Ann. §§ 71-925(1), 71-908; Nev. Rev. Stat. §§ 433A.310(1), 433A.115(2); N.H. Rev. Stat. Ann. §§ 135-C:34, 135-C:27(1); N.J. Stat. Ann. §§ 30:4-27.2(m), 30:4-27.2(h); N.M. Stat. Ann. §§ 43-1-11(E), 43-1-3(M); N.C. Gen. Stat. Ann. §§ 122C-268(j), 122C-3(11); N.D. Cent. Code Ann. §§ 25-03.1-07, 25-03.1-02(14), (21); Ohio Rev. Code Ann. §§ 5122.15(C), 5122.01(B); 50 Pa. Stat. and Const. Stat. Ann. §§ 7304(a), 7301; S.C. Code Ann. § 44-17-580(A); S.D. Codified Laws §§ 27A-1-2, 27A-1-1(6)-(7); Tex. Health & Safety Code Ann. § 574.034(a); Utah Code Ann. § 62A-15-631(16); VT. Stat. Ann. tit. 18, §§ 7611, 7101(17); Va. Code. Ann. § 37.2-817(C); Wash Rev. Code Ann. § 71.05.240(3); W. Va. Code Ann. §§ 27-5-4(k), 27-1-12(a); Wis. Stat. Ann. §§ 51.20(1)(a)(1), 51.20(1)(a)(2); Wyo. Stat. Ann. §§ 25-10-110(j), 25-10-101(a)(ii).

[8] "Marked" is defined as "very noticeable."   Marked, Britannica.com, https://www.britannica.com/dictionary/marked (last visited March 21, 2023).   And "subnormal" means "lower or smaller than normal."   Subnormal, Britannica.com, https://www.britannica.com/dictionary/subnormal (last visited March 21, 2023).   Thus, an individual with "marked subnormal" intelligence is someone with very noticeable, low intelligence.   *See, e.g.*, Henry v. Dees, 658 F.2d 406, 411 (5th Cir. 1981) (noting that the defendant's "intelligence quotient places him in the educable mental retardate category").

[9] Mental Illness, *Black's Law Dictionary* (11th ed. 2019) ("A disorder in thought or mood so substantial that it *impairs* judgment, behavior, perceptions of reality, or the ability to cope with the ordinary demands of life." (emphasis added)).

[10] Legally Incapacitated Person, *Black's Law Dictionary* (11th ed. 2019 (explaining that a legal "incompetent" is

21

not equivalent to the statutory definitions at issue.  *See United States v. Hansel*, 474 F.2d 1120, 1125 (8th Cir. 1973) (recognizing that "the term 'mental defective' has on occasion, been given a more expansive meaning by courts and legislatures").  These related definitions only matter if they result in someone being *adjudged defective* or *involuntarily committed*.  The legal determination is the operative status in the statute, not the underlying cause.  As such, simply having a mental illness does not approach the necessary showing to fall under the statute's prohibitions.

The statute's disconnect from "mental illness" alone is further exemplified by the fact that the statutory standard is not *limited* to individuals who have been adjudged or committed based on their mental health.  For example, someone who was committed to a mental institution for drug usage would not necessarily fit into one of the previously discussed categories—marked subnormal intelligence, mentally ill, or incapacitated.   Nonetheless, the statute would still include them in its reach.  As a result, following Defendant's logic, it could be argued that the societal problem § 922(g)(4) seeks to address is "firearm violence by those with below average intelligence," or "firearm violence by the incompetent" or "firearm violence by someone who uses drugs."   The Court rejects this simplistic framing.

Rather, the societal problem that § 922(g)(4) addresses must encompass *all* of these individuals so long as they have been adjudged defective or involuntarily committed.   So, what do they all have in common?   To answer this question, the Court looks to the sole commonality of the two definitions: individuals who have been determined to be a danger to themselves or

---

synonymous with a "leally incapacitated person," which means "[a] person, other than a minor, who is temporarily or permanently impaired by mental illness, mental deficiency, *physical illness* or disability, or *alcohol or drug use* to the extent that the person *lacks sufficient understanding to make or communicate responsible personal decisions* or to enter into contracts" (emphasis added)).

others.

This answer is supported by legislative history. As the Supreme Court recognized long ago, Congress enacted the Gun Control Act of 1968 ("GCA") because "it was concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). The GCA's broadly stated purpose "was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Id.* (quoting S.Rep. No. 1501, 90th Cong., 2d Sess. 22 (1968)); *see also* 114 Cong. Rec. 13219 (1968) (remarks by Sen. Tydings). After all, "[n]o one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses from buying, owning, or possessing firearms. This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons." 114 Cong.Rec. 13647, 21784 (1968). "In order to accomplish this goal, Congress obviously determined that firearms must be kept away from persons . . . who might be expected to misuse them." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983).

More specifically, Congress had two purposes for enacting § 922(g)(4): (1) protecting the community from crime and (2) preventing suicide, both of which were intended to be accomplished by "cut [ting] down or eliminat[ing] firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances." *See* 114 Cong. Rec. 21,829 (1968). Thus, members of Congress thought it necessary to prevent dangerous individuals who are likely to "commit sudden, unpremeditated crimes with firearms as a result of mental disturbances" from possessing those firearms. *Id.* In

23

doing so, the statutory provision aimed to prohibit firearm ownership among those who "by their previous conduct or mental condition" have *proven* themselves "incapable of handling a dangerous weapon in . . . an open society."   *Id.* at 21,809-10 (statement of Rep. Tenzer).

Thus, the societal problem § 922(g)(4) seeks to address is firearm violence by individuals who have been determined to be a danger to themselves or others—not firearm violence by those who simply have any kind of mental illness.

### 2.   Historical basis for Section 922(g)(4)

Having determined the societal problem at play, the second step of a Second Amendment challenge is deciding whether the regulation is consistent with the Nation's historical tradition of firearm regulation.   *Bruen*, 142 S. Ct. at 2129–30.   To do this, the Court must determine whether the Government has met its burden of showing that prohibiting individuals who have been determined to be a danger to themselves or others from possessing firearms is consistent with the Nation's historical tradition of firearm regulation.[11]   As detailed below, the Government has met this burden.

To start, the Government does not rebut Defendant's contention that a formal regulation prohibiting the possession of firearms by the *mentally ill* did not exist at the time the Second Amendment was enacted.   (*See* ECF No. 43.)   Nevertheless, the Government suggests that the absence of historical statutory prohibitions on firearm possession may have been the consequence of the fact that "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'"   (*Id.* at 7 (citing Carlton F.W.

---

[11] The Court stresses that district courts are "ill equipped to conduct the type of searching historical surveys that the [*Bruen*] Court's approach requires," *Bruen*, 142 S. Ct. at 2179 (Breyer, J., dissenting), even if cases are to be decided "based on the historical record compiled by the parties," *id.* at 2130, n. 6 (Thomas, J.).

Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit,* 60 HASTINGS L.J. 1371, 1377 (2009); Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5-21, 29, 43 (1994) (explaining that these individuals were often removed from the community at large through home confinement or involuntary commitment to welfare and penal institutions).)   As such, the Government reasons that "formal laws regarding disarmament were simply unnecessary." (*Id.* at 12 n.7.)   Other courts have used this rationale to conclude that "[i]f eighteenth century America viewed it as a permissible infringement on liberty to 'lock up' individuals of unsound mind, then a lesser intrusion on liberty such as a prohibition on firearm possession would seem to have been permissible, as well." *Keyes v. Lynch*, 195 F. Supp. 3d 702, 718 (M.D. Pa. 2016) (citing *Larson*, supra).

Further bolstering its argument, the Government presents a history of restrictions aimed at preventing persons considered to be dangerous to themselves or others from possessing and using firearms. (ECF No. 43 at 9–12, 13–14.)   In particular, the Government points to the 1689 English Declaration of Rights, (*id.* at 9), which *Heller* identified as "the predecessor of our Second Amendment," 554 U.S. at 593.   The Declaration provided that "the subjects which are Protestants may have arms for their defense *suitable to their conditions* and *as allowed by law*. 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1698) (emphasis added).   The Government also cites the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, another "highly influential" "precursor" to the Second Amendment, *Heller*, 554 U.S. at 604, in support of its position, (ECF No. 43 at 7).   That Address notes that at the time of the Second Amendment's ratification, citizens were excluded from the right to bear arms if they posed a "real danger of public injury." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010).

Further, the Government provides copious sources discussing the historical basis of laws disarming individuals deemed "dangerous" to society.   (*See, e.g.*, ECF No. 43 at 7 (citing Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA. L. REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century . . . have excluded infants, idiots, lunatics, and felons [from possessing firearms].")); *id.* at 14 (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) (identifying classes of individuals perceived to be dangerous and disarmed during the colonial era).)   In fact, this Court recently detailed the United States's historical tradition for laws prohibiting individuals deemed "dangerous" from possessing firearms in the interest of public safety.  *See Nutter*, 2022 WL 3718518, at *5–8.

As this Court explained, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."  *Nutter*, 2022 WL 3718518, at *8 (quoting *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting)).)   And "[c]ommon sense tells us that the public understanding of the Second Amendment at the time of its enactment, which allowed for disarmament of Blacks and Native Americans based on their perceived threat, would have accepted disarmament of people" who have been involuntarily committed to a mental institution because they were part of "a group found by the legislative branch to present a danger of misusing firearms."  *See id.*   Thus, despite Defendant's claims, "[n]othing in the historical record suggests a popular understanding of the Second Amendment at the time of the founding that extended to preserving gun rights for groups who pose a particular risk of using firearms against [themselves or other] innocent people."  *See id.*

When the *Heller* Court interpreted the Second Amendment, it reviewed history and

tradition from England, the colonial and founding periods, and the nineteenth century to determine how that history and tradition informed or reflected the founding-era understanding of the Second Amendment.   Examining these same kinds of sources to identify the historical justification for § 922(g)(4) reveals one controlling principle that applies to each historical period: dangerous persons could be disarmed.   Accordingly, because there is a historical basis for disarming individuals that have been determined to be dangerous to themselves and/or the public at large, § 922(g)(4) is constitutional on its face.

## IV.   CONCLUSION

For these reasons, Defendant's *Bruen*-Based Motion to Dismiss, (ECF No. 40), is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:      May 5, 2023

THOMAS E. JOHNSTON, CHIEF JUDGE